IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF MISSISSIPPI

UNITED STATES OF AMERICA

V.                                                    CRIMINAL CASE NO. 3:22-CR-82-SA-RP

CHARLES DERRYBERRY                                                          DEFENDANT

ORDER AND MEMORANDUM OPINION

On January 20, 2023, the Defendant, Charles Derryberry, filed a Motion to Suppress [41]. The Government filed a Response [46] in opposition. The Court initially held a hearing on the Motion [41] on February 6, 2023. The following day, Derryberry filed a Supplemental Brief [57]. In the supplemental filing, Derryberry raised the issue of "newly discovered evidence" and requested that the suppression hearing "be reopened in order to address [] credibility concerns." [57] at p. 1-2. The Court agreed and held a second hearing on February 9, 2023. Having reviewed all pertinent evidence and considered the applicable authorities, the Court is now prepared to rule.

*Relevant Factual Background*

On July 20, 2022, Derryberry was charged in a one-count Indictment [1]. The single charge against him is for knowing possession of a firearm as a convicted felon. The charge stems from a vehicular stop that occurred around 8:45 PM on Sunday, February 27, 2022.

On that night, Captain Jack Theobald of the Lafayette County Sheriff's Office initiated a stop of a white Chevrolet truck, allegedly based on a speeding violation. The vehicle was driven by Jane Smith. Jane's mother, Mary Smith, was in the passenger seat.[1] Derryberry, who was apparently in a romantic relationship with Jane (at least to some extent), was in the back seat.[2]

---

[1] Consistent with the Court's instructions and for reasons which will be made clear hereinafter, the parties use the aliases Jane Smith and Mary Smith in their public filings when referring to the driver and passenger of the truck. At the hearing on the Motion [41], counsel, the witnesses, and the Court referred to Mary and Jane by their real names. The Court ordered that the transcript from both hearings be sealed.

[2] For the sake of clarity, the Court notes that Derryberry's alias is "Frost."

1

Prior to the stop, Mary sent text messages and made phone calls to Lafayette County Chief Deputy Scott Mills and Criminal Investigator Brad McDonald regarding the presence of narcotics in the vehicle. Mills and Investigator McDonald both testified that Mary had provided information to their Office "off and on" for a period of approximately twenty years prior to the night in question. Neither Mills nor McDonald were on duty on the night in question, but they both relayed this information to Theobald, who was the Captain on duty for the night shift which ran from 6:00 PM to 6:00 AM.

Since some of the information was provided via phone call, there is no written documentation of precisely what Mary told Mills and/or McDonald. But the gist of that information was that there were drugs coming into the Harmontown area in a white Chevrolet truck.[3] The text messages refer only to "product," but Mills, McDonald, and Mary all testified that Mary provided more specific details as to the type of drugs in their phone conversations. Mills testified that, after communicating with Mary, he told Theobald to attempt to locate the truck and "try to get a stop" on it.

Consistent with this instruction, Theobald, along with Deputies Trae Pruitt and Larry Wellman, attempted to locate the truck. All three were traveling in different vehicles. While traveling east on Highway 310, Theobald saw a truck matching the description. The truck was traveling westbound on Highway 310. Although Theobald was not equipped with a radar gun and was traveling in the opposite direction, he testified that the vehicle was traveling at least ten miles per hour in excess of the posted speed limit of 55 mph. He turned around, chased down the vehicle, and eventually initiated a stop. Pruitt and Wellman arrived at the scene of the stop at some point thereafter.

---

[3] While not addressed in great detail at the hearings, the Court does find it relevant to note that Harmtontown is a small community.

Although Theobald testified that a brief portion of the stop (at the beginning) was not recorded because he forgot to turn on his body camera, most of the stop was recorded. The footage from Theobald's body camera was admitted at the hearing, in addition to being attached to Derryberry's Motion [41].[4] Theobald testified that, at this time, he did not know which of the passengers was the confidential informant, but at some point during the stop he became aware that Mary was, in fact, the informant. When Theobald approached the truck, Derryberry was laying across the backseat of the truck with his head on the back seat on the passenger side.

Jane exited the truck, and Theobald began conversing with her. After some preliminary questions, Theobald asked her about the presence of narcotics in the truck. After further conversation, he obtained her consent to search the truck. The voluntariness of that consent (or lack thereof) was raised in Derryberry's Motion [41] and will be addressed more fully hereinafter. Nonetheless, Theobald, consistent with Jane's consent, searched the truck. During Theobald's search, Derryberry was standing behind the truck conversing with Pruitt. Eventually, Theobald located a firearm under the back seat on the passenger side—near the place where Derryberry's head had been located when he was laying across the backseat when the stop was initiated.

After locating the firearm, Theobald approached Derryberry (behind the truck) and questioned him about the firearm. During that conversation, Derryberry admitted that he was a convicted felon but adamantly denied owning the gun or even having any knowledge of its presence in the vehicle. Theobald nevertheless placed handcuffs on Derryberry and advised that he would try to get it "straightened out." Derryberry was not *Mirandized* at this time. While handcuffed, Derryberry continued to stand beside Pruitt behind the truck. Derryberry then began conversing (loudly) with Jane and Mary, who were located in front of the truck. During this

---

[4] Because the confidential informant can be seen on the body camera footage, the Court sealed the videos on the docket in this case.

conversation, Derryberry continued to deny ownership of the firearm. However, after some reference was made to all three of them going to jail if nobody took responsibility for the firearm, Derryberry called Theobald back over and advised Theobald that he was going to "hold up" for the firearm. After briefly speaking with Jane and Mary, Derryberry was eventually placed in a police car at the scene—still not having been *Mirandized*.

Thereafter, a female deputy, Deputy Amanda Drew, arrived on scene. Throughout the stop, Jane consistently requested to be permitted to use the restroom. When Drew arrived, she walked Jane to a nearby place so that Jane could do so. At this time—when Jane was using the restroom and Derryberry was in the police car—Mary told Theobald that she does not know where the drugs are but that her sister told her that they had a ¼ ounce of fentanyl and ½ ounce of Ice (methamphetamine). It is undisputed that the deputies never located fentanyl or methamphetamine inside the truck or on the person of Derryberry or Jane.

However, while Jane was using the restroom, Drew did locate a pipe hidden in Jane's pants. Jane then told Theobald that the pipe belonged to Derryberry. Theobald walked to the police car and asked Derryberry about the pipe. During that conversation, Derryberry agreed to also "hold up" for the pipe. He further admitted to having previously used methamphetamine earlier that afternoon but stated that the rest of the drugs had been left behind at a residence in Byhalia, Mississippi. Again, no *Miranda* warnings were issued to him.

Theobald eventually allowed Jane and Mary to leave the scene in the truck with Mary driving—because Jane did not have a valid driver's license with her. No traffic citations were issued.

In his Motion [41], Derryberry raises multiple arguments in favor of suppression: that the deputies lacked reasonable suspicion to stop the vehicle; that the confidential informant's

information was unreliable and incredible; that the stop was pretextual; that Jane's consent to search the vehicle was involuntary and coerced; and that Derryberry was never *Mirandized*.

### Burden of Proof

"In general, 'on a motion to suppress, the defendant has the burden of proving, by a preponderance of the evidence, that the material in question was seized in violation of his constitutional rights.'" *United States v. Portillo-Saravia*, 379 F. Supp. 3d 600, 612 (quoting *United States v. Roch*, 5 F.3d 894, 897 (5th Cir. 1993)). However, "[t]his burden . . . shifts to the Government if the search or seizure in question was performed without a warrant." *Id.* (citing *United States v. Guerrero-Barajas*, 240 F.3d 428, 432 (5th Cir. 2001)); *see also United States v. Martinez*, 486 F.3d 855, 859-60 (quoting *Roch*, 5 F.3d at 897) ("Where the facts are undisputed that the arrest and seizures were made without benefit of warrants of any kind, the government bears the burden of proving it had reasonable suspicion to seize the defendant."). A preponderance of the evidence standard is applicable. *See United States v. Matlock*, 415 U.S. 164, 177 n. 14, 94 S. Ct. 988, 39 L. Ed. 2d 242 (1974).

### Analysis and Discussion

Although Derryberry's Motion [41] raises five distinct bases for suppression, the contested matter before the Court at this time is more narrow. The Court will address and clarify the uncontested issues first.

### I.     Miranda

As to the statements Derryberry made at the scene of the arrest, the Fifth Amendment protects an individual's right to not be a witness against himself in a criminal case. U.S. Const. amend. V. *Miranda* requires an officer to advise a suspect of various rights before engaging in a custodial interrogation. *See Edwards v. Arizona*, 451 U.S. 477, 481-82, 101 S. Ct. 1880, 68 L. Ed.

2d 378 (1981). "A suspect is in custodial interrogation for purposes of *Miranda* 'when placed under formal arrest or when a reasonable person in the suspect's position would have understood the situation to constitute a restraint on freedom of movement of the degree which the law associates with formal arrest.'" *United States v. Melancon*, 662 F.3d 708, 711 (5th Cir. 2011) (quoting *United States v. Bengivenga*, 845 F.2d 593, 596 (5th Cir. 1988)). The inquiry requires an objective consideration of whether "a reasonable person [would] have felt he or she was at liberty to terminate the interrogation and leave." *United States v. Ortiz*, 781 F.3d 221, 229 (5th Cir. 2015) (quoting *United States v. Wright*, 777 F.3d 769, 774-75 (5th Cir. 2015)).

At the suppression hearing (as well as in its Response [46]), the Government conceded that Derryberry was subjected to a custodial interrogation for purposes of *Miranda* after he was handcuffed. Therefore, because Theobald did not advise Derryberry of his *Miranda* rights at that time, the statements Derryberry made after being handcuffed must be suppressed. As stated by Derryberry in his Motion [41], this includes "the admission to the drug pipe, what he smoked, where the drugs were located, and the admission to the firearm." [41] at p. 22.

Derryberry is correct. These statements are inadmissible and are hereby SUPPRESSED. To the extent Derryberry's Motion [41] seeks that relief, it is GRANTED.

II. *Consent*

Derryberry also asserts that Jane's consent for Captain Theobald to search the truck was involuntary and the product of coercion. The parties' dialogue as to consent is captured on the body camera footage:

> *Theobald*:     Alright, you're giving me permission to search the
> vehicle to make sure there's nothing inside, right?
>
> *Jane*:          I don't . . . I don't.

6

*Theobald*:    You said there's nothing in the vehicle and nothing to hide, right? Nothing to hide?

*Jane*:    I don't have anything . . . I don't know what that means . . . Do I have to give you permission?

*Mary*:    Well, I'm not giving you consent to search the vehicle.

*Jane*:    It's her [Mary's] vehicle. It's not my vehicle.

*Theobald (to Mary)*:    Are you giving me permission to search the vehicle?

*Mary*:    No, I'm not. No. No, I'm not.

*Theobald (to Jane)*: If we can check the vehicle and make sure nothing is going on. We can then let you go. So, there's nothing in the vehicle that I need to know about, right?

*Jane*:    Yeah. Nothing.

*Theobald*:    So, you are giving me consent to search the vehicle.

*Jane*:    Okay. Alright.

*Theobald*:    Say yes.

*Jane*:    Yes.

Although warrantless searches violate the Fourth Amendment, one exception to that general rule is a consent search. *See, e.g.*, *United States v. Iraheta*, 764 F.3d 455, 462 (5th Cir. 2014) (quoting *United States v. Jaras*, 86 F.3d 383, 388 (5th Cir. 1996)) ("It is well-established that warrantless searches violate the Fourth Amendment unless they fall within a specific exception to the warrant requirement, and that consent is one of the specifically established exceptions to the requirements of both a warrant and probable cause."). To establish consent, the Government "must demonstrate by a preponderance of the evidence that such consent is: (1) voluntary; and (2) given by the defendant himself (actual authority) or by a third party with the ability to furnish valid

consent (apparent authority)." *Id.* (citing *Jaras*, 86 F.3d at 389). Here, Derryberry contends that Jane's consent was involuntary.

The Fifth Circuit has on multiple occasions articulated six relevant factors for determining whether consent was voluntarily given: "(1) the custodial status of the person giving consent; (2) whether law enforcement used coercive procedures; (3) to what extent and level the person giving consent cooperated with law enforcement; (4) the person's awareness of [her] right to refuse consent; (5) the person's intelligence and education; and (6) the person's belief that no incriminating evidence will be found." *United States v. Kimbrough*, 2022 WL 327719, at *1 (5th Cir. Feb. 3, 2022) (per curiam) (citations omitted).

In its Response [46], the Government did not address the voluntariness issue but instead argued that Derryberry lacked standing to raise that argument. The Fifth Circuit has consistently held that an automobile passenger lacks standing to contest a driver's consent. *See*, *e.g.*, *United States v. Rodriguez*, 33 F.4th 807, 811 (5th Cir. 2022); *United States v. Wise*, 877 F.3d 209, 218 (5th Cir. 2017); *United States v. Roberson*, 6 F.3d 1088, 1091 (5th Cir. 1993).

At the commencement of the initial suppression hearing, defense counsel conceded that Derryberry lacks standing to raise the consent argument. Having reviewed the applicable case law, the Court agrees. Derryberry lacks standing to challenge Jane's granting of consent for Theobald to search the vehicle. To the extent Derryberry's Motion [41] seeks suppression on that basis, it is DENIED.

### III.    *Validity of the Stop*

Derryberry raised three additional arguments—(1) that the officers lacked reasonable suspicion to stop the vehicle; (2) that the confidential informant's information was unreliable and

incredible; and (3) that the stop was pretextual. While raised as three separate arguments, each of these contentions go to whether the stop was valid.

For obvious reasons, this issue is critical. If the entire stop was unconstitutional—as Derryberry contends—all evidence from the stop must be suppressed. *See*, *e.g.*, *United States v. Labrador-Peraza*, 563 F. Supp. 3d 563, 570 (W.D. La. 2021) (citing *United States v. Ganzer*, 922 F.3d 579, 584 (5th Cir. 2019)) ("The exclusionary rule operates to exclude the prosecution from introducing evidence obtained unconstitutionally.").

The Fourth Amendment is implicated when an individual is subjected to either a search or seizure. U.S. Const. amend. IV. "The stopping of a vehicle and detention of its occupants constitutes a 'seizure' under the Fourth Amendment." *United States v. Brigham*, 382 F.3d 500, 506 (5th Cir. 2004). Traffic stops that are not conducted in the course of an arrest are analyzed under *Terry*. *Id.* (citing *Berkemer v. McCarty*, 468 U.S. 420, 439, 104 S. Ct. 3138, 3150, 82 L. Ed. 2d 317 (1984)) (additional citations omitted).

The legality of a traffic stop is governed by the analysis set forth in *Terry v. Ohio*, 392 U.S. 1, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968). This standard is a two-pronged reasonable suspicion inquiry: (1) whether the officer's action was justified at its inception; and (2) whether the search or seizure was reasonably related in scope to the circumstances that justified the stop. *Id.* "Reasonable suspicion exists when the officer can point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant the search and seizure." *United States v. Lopez-Moreno*, 420 F.3d 420, 430 (5th Cir. 2005). This determination is typically based upon an assessment of the officer's credibility. *See Florida v. J.L.*, 529 U.S. 266, 274, 120 S. Ct. 1375, 146 L. Ed. 2d 254 (2000) ("When a police officer testifies that a suspect aroused the officer's suspicion . . . the courts can weigh the officer's credibility.").

"Reasonableness, in turn, is measured in objective terms by examining the totality of the circumstances." *Ohio v. Robinette*, 519 U.S. 33, 39, 117 S. Ct. 417, 136 L. Ed. 2d 347 (1996).

In the present case, there are two purported reasons for the stop—(1) that the vehicle was speeding; and (2) the tip from the confidential informant.

A. *Traffic Violation – Speeding*

In analyzing this issue, courts must consider the totality of the circumstances and must do so from an *objective* standpoint, as "an officer's subjective motivations are irrelevant in determining whether his or her conduct violated the Fourth Amendment." *Lopez-Moreno*, 420 F.3d at 432 (citing *Devenpeck v. Alford*, 543 U.S. 146, 125 S. Ct. 588, 160 L. Ed. 2d 537 (2004)). "So long as a traffic law infraction that would have objectively justified the stop had taken place, the fact that the police officer may have made the stop for a reason other than the occurrence of the traffic infraction is irrelevant for purposes of the Fourth Amendment." *Id*. (citations omitted).

At the initial suppression hearing, Theobald testified that when he spotted the white truck, he was traveling eastbound on Highway 310, and the truck was traveling westbound. On direct examination, he testified that he believed the truck was traveling at least ten miles per hour over the posted speed limit of 55 mph. On cross examination, Theobald was unable to specifically testify as to whether his vehicle was stopped or still moving at the time he observed the white truck passing him. He also estimated that the truck was initially around 100 yards away when he first spotted it. But he conceded that it was dark and that he was traveling in the opposite direction.

In addition, although cognizant that an *objective* standard is applicable in analyzing the validity of the stop, the Court notes that Theobald himself admitted that the purpose of the stop was to locate narcotics. The Government's Response [46] similarly indicates that "[t]his was not

a traffic stop for speeding. The police stopped the vehicle based on the information provided by the informant." [46] at p. 10.[5]

Ultimately, the Court is not convinced that Theobald had reasonable suspicion to stop the vehicle for speeding. The Court finds that the Government fails to meet its burden on that issue.

B.    *Confidential Informant's Tip*

That brings the Court to the main contested issue—whether the tip from Mary was sufficient to justify the stop.

"Reasonable suspicion can be formed by a confidential informant's tip so long as the information is marked by 'indicia of reliability.'" *United States v. Powell*, 732 F.3d 361, 369 (5th Cir. 2013) (quoting *Adams v. Williams*, 407 U.S. 143, 147, 92 S. Ct. 1921, 32 L. Ed. 2d 612 (1972)). The Fifth Circuit, in accordance with Supreme Court precedent, has delineated factors to be considered in determining whether a tip provides reasonable suspicion: (1) the credibility and reliability of the informant; (2) the specificity of the information contained in the tip or report; (3) the extent to which the information in the tip or report can be verified by officers in the field; and (4) whether the tip or report concerns active or recent activity, or has instead gone stale. *Id.* (citing *United States v. Martinez*, 486 F.3d 855, 861 (5th Cir. 2007)). This is a totality of the circumstances test—"[n]o single factor is dispositive and a deficiency in one may be compensated for, in determining the overall reliability of a tip, by a strong showing as to the other, or by some other indicia of reliability." *United States v. Jackson*, 328 F. App'x 933, 936 (5th Cir. 2009) (quoting *United States v. Jackson*, 818 F.2d 345, 348 (5th Cir. 1987)).

---

[5] The Court also notes that, in its Response [46], the Government indicates that at least three other Circuits— the Fourth Circuit, Eighth Circuit, and Tenth Circuit— have held that an officer's visual estimate of a car's speed is sufficient for purposes of conducting a traffic stop. Counsel for both parties stated at the hearing that the Fifth Circuit has not issued any guidance on that specific topic.

  i.  *Credibility and reliability of the informant*

During the Government's case in chief, Mills and McDonald both testified that Mary had provided them information "off and on" for nearly twenty years.

Mills testified that the information Mary had provided him in the past "tended to be reliable." [66] at p. 10. He testified that Mary has made controlled narcotics purchases for Lafayette County and given information that he has been able to verify in the past. In addition, Mills testified that information Mary has provided him has served as the basis for arrests. However, when specifically questioned about that issue on cross examination, he was unable to provide a specific number of arrests that resulted from the information she provided.[6]

When questioned about the fact that his text messages with Mary did not reference any specific type of narcotics, Mills testified that the text messages did not constitute the only information he received—he also talked to Mary on the phone on the night in question. He stated that he believed he spoke with her on the phone *prior to* receiving the first text message from her. Mills testified that Mary made him aware that the types of drugs in question were fentanyl and methamphetamine and that he learned this information through his phone conversations with Mary—not the text messages. Additionally, Mills testified that he had previously talked to Mary about Jane's lifestyle. More specifically, Mills stated that Mary had expressed to him serious concerns about Jane's well-being and her regular drug use. Mills testified that he believed Mary's motivation was, at least in part, to get help from law enforcement for her daughter. According to Mills, he believed Mary's motivation for providing the tip to law enforcement about the drugs was, in a way, to help Jane.

---

[6] On cross examination, defense counsel asked Mills whether he would have any reason to dispute the Government's representation in its Response [46] that information Mary provided in the past had led to four or five arrests. Mills testified that he had no reason to dispute that number.

McDonald's testimony was similar in nature. Like Mills, he testified that information Mary provided to him in the past has led to arrests but denied knowledge of a specific number of arrests. He also communicated with Mary via text message and phone calls on the night in question. Similar to Mills, McDonald stated that Mary advised in a phone call that there was fentanyl in the truck. McDonald added that, according to Mary, it was a "substantial" amount of fentanyl. McDonald stated that he did not question Mary too extensively on the tip because she had been reliable in the past and he could also sense that she was trying to be discrete and hurry off the phone.

On cross examination, defense counsel questioned McDonald about whether Mary had provided bad information to him in the past. McDonald testified that there have been instances when she advised that there was a "substantial" amount of narcotics when it turned out that the amount was not so substantial. But he did not testify as to any previous circumstances when he felt that Mary provided information that was *wholly* false.

Mary testified that she has provided information "off and on" since her 1999 larceny conviction. Mary admitted to the existence of numerous felony convictions and arrests on her record. On direct examination, Mary testified that she did not like Jane being involved with Derryberry. She stated that she was concerned about her daughter's drug and gang activity. She testified that Jane had overdosed 18 times and that this information was her motivation for providing law enforcement with information on her own daughter. Mary stated that she had previously had conversations with members of the Sheriff's Office and that they were going to assist with getting Jane help.

On cross examination, defense counsel questioned Mary about whether, on the night in question, she was providing information to law enforcement to work off criminal charges. In pertinent part, Mary's testimony on that point was as follows:

> Q. All right. So let's talk about February 27th. Okay?
>
> A. Okay.
>
> Q. And I do think this is relevant, and I'll explain. You had just pled guilty to the auto burglary two days before this arrest, right?
>
> A. That's correct.
>
> Q. Okay. And - - but you were not sentenced yet; is that right?
>
> A. No. I'd bonded out.
>
> Q. Uh-huh. But you pled guilty, right? You entered a plea of guilty; but you had not been sentenced, correct?
>
> A. I don't - -
>
> Q. Have you been sentenced on the auto burglary?
>
> A. I don't remember. I don't. But I don't think so.
>
> Q. You, at this time - - February 27th of 2022, you were working off charges; were you not?
>
> A. I was not working off charges. They were doing a favor for me for my daughter. My daughter was out gang banging; my daughter was out drug using; my daughter had done OD'd 18 times.
>
> . . .
>
> Q. So Brad McDonald earlier testified that you were working off charges with Oxford Police Department. Is that true or not?
>
> A. I didn't know I was working off charges, no, ma'am. I went to them and asked them for help with my daughter.

[67] at p. 23-24.

At the second hearing, defense counsel again questioned Mary about her motivation for providing information to law enforcement and, more particularly, whether, in February 2022, she was working off charges. Defense counsel introduced documents indicating that on February 25, 2022—just two days prior to the night Derryberry was arrested—Mary had pled guilty to automobile burglary in Lafayette County Circuit Court. Although Mary pled guilty to automobile burglary that day, her sentence was deferred. Mickey Mallette, the former Assistant District Attorney for Lafayette County who prosecuted the case, testified that, although not specifically remembering the facts of Mary's case, the deferred sentence would be indicative that she might be working with law enforcement to mitigate her potential sentence.[7] At the second hearing, Mary again stated that her motivation was to get help for her daughter, but she also did agree that she was working with law enforcement "to get a lighter sentence."

The Court is cognizant of Mary's criminal history—much of which concerns convictions for crimes involving dishonesty. At the initial hearing, Mary testified that her motivation for providing information to law enforcement was solely to get Jane help with her drug activity. At the second hearing, she maintained that she wanted to get help for Jane, but she also admitted an alternative motive—that is, the potential of a lighter sentence.

As to the desire to get her daughter help, the Court notes some corroboration. Mills specifically testified—at both hearings—that Mary told him that she would like to get law enforcement involved to help Jane. The Court found Mills' testimony on that point to be credible. Furthermore, the Court notes that Mary's conduct on the night in question was consistent with this being her motivation. For example, after the stop concluded without drugs being located, she sent

---

[7] A separate charge against Mary for possession of a controlled substance, for which she was indicted in September 2021, was retired to the files via an order signed by the circuit court judge on February 25, 2022.

a text message to Mills expressing significant disappointment. The Court finds this to be indicative of her intent being to get help for her daughter—not get credit for providing information to law enforcement. In essence, considering the way in which the events unfolded on the night in question, including the text messages, Mary's explanation made sense.

Conversely, at the second hearing, Mary conceded that she was providing information to Metro Narcotics to "get a lighter sentence." She did not testify to that fact at the first hearing. In fact, her testimony at that time was that she did *not* know she was working off charges. This undoubtedly weighs against Mary's credibility.

Ultimately, taking all of this into account, it is not lost on this Court that Mary has an extensive criminal history and that she certainly had an incentive to provide information to law enforcement. As to the criminal history, the Court notes that Mills and McDonald both testified that Mary has provided accurate information to them in the past *after* she became a convicted felon. As to her incentive, the Court recognizes that more than one reason may very well have motivated her conduct. But, in short, the Court believed Mary's testimony that she was motivated by her desire to help her daughter. And, again, the Court does note that Mills unequivocally testified to having had conversations with Mary about her desire to get help for Jane *prior to* the night in question.

Having given significant consideration to all of these facts, the Court finds that this factor weighs in favor of the Government.

*ii.    Specificity of the information contained in the tip*

As noted above, Mills, McDonald, and Mary's testimony were all consistent insofar as they concerned the fact that Mary provided information to Mills and McDonald in the form of *both* phone conversations and text messages on the night of February 27, 2022.

At this juncture, the Court again notes—as emphasized by defense counsel—that none of the text messages refer to any specific types of drugs but, instead, generally refer to "product." The text messages are similarly lacking in specificity as to the type of vehicle in which they would be traveling. Thus, the *existence of* phone conversations and the *substance of* those conversations are crucial.

As noted above, Mills, McDonald, and Mary all testified that phone conversations did in fact occur. Although cognizant of defense counsel's contention in closing argument that there had been testimony throughout the hearing that cell phone service in this area was poor—yet there were apparently numerous phone conversations happening which addressed one of the critical issues in this case—the Court found the witnesses' testimony to be credible. And despite defense counsel's argument, the Court has *no* evidence before it to indicate that those phone conversations did not actually occur.

Concerning the substance of those calls, Mills testified that Mary relayed to him that Jane and Derryberry would be coming through the Harmontown area and would be transporting fentanyl and methamphetamine in a pickup truck. Mills did not testify that he was made aware of the color, make, or model of the truck. On cross examination, Mills admitted that he did not ask how the drugs would be packaged, and he did not recall asking Mary about the amount of narcotics.

McDonald testified that in his phone conversations with Mary, she told him that Jane would be in a white Chevrolet truck. He did not recall whether he knew the model of the white truck. He testified that Mary told him Jane would be transporting a substantial amount of narcotics. On cross examination, McDonald stated that Jane did specifically tell him that it would be fentanyl.

Prior to initiating the stop, Theobald never talked to Mary. However, Mills and McDonald both stated that the action they took in response to the information they learned was to notify

Theobald—the Captain on duty at the time. Thus, Theobald's only sources of information were Mills and McDonald. Although Mills and McDonald testified to not remembering whether they knew the model of the truck, Theobald testified that Mills and McDonald told him to be on the lookout for a white, four door Chevrolet truck. In fact, on cross examination, Theobald specifically testified that McDonald contacted him first and told him to be on the lookout for a white, four door Chevrolet truck and that the tag would be registered to an Orville Clolinger. This is certainly more information than Mills and McDonald testified to Mary telling them—both as to the specifics of the truck and the tag registration. This inconsistency is noteworthy.

Concerning the specifics as to the types of drugs, Theobald testified that he did not know the details as to the types of drugs that would be in the truck nor the weight or packaging of them. Theobald's conduct at the scene was consistent with a lack of knowledge on this point. As emphasized by defense counsel, the body camera footage clearly shows that Theobald did not wear gloves when he was searching the truck. Theobald testified that he typically would wear gloves if he was suspicious of the presence of fentanyl.

This testimony certainly weighs in favor of the perceived presence of fentanyl never being relayed to Theobald. Taking it a step further, it also weighs in favor of Mary never telling Mills and McDonald about fentanyl at all. Although it was not specifically testified to at the hearing, it is logical to this Court that, considering the dangerousness of fentanyl and the extensive experience of the law enforcement officers involved, this information would have been relayed to Theobald.

The Court therefore cannot help but question the specificity of the information that Mary actually provided to Mills and McDonald. This factor weighs in favor of suppression.

### iii.     *Verification by officers in the field*

As to the ability of the officers to verify the tip, the Court first notes that, despite thoroughly searching the truck, Theobald located neither fentanyl nor methamphetamine. He was able to verify other information that Mary provided to Mills and McDonald, such as the description of the truck and the fact that Derryberry and Jane would be located inside the truck, but he was, critically, unable to find narcotics, despite testifying that this was his main mission in initiating the stop. The Court finds that this factor weighs in favor of suppression.

### iv.     *Active or recent activity*

The final factor concerns "whether the tip or report concerns active or recent activity, or has instead gone stale." *Powell*, 732 F.3d at 369. Derryberry concedes that this factor weighs in favor of the Government. It is undisputed that Mary was providing information to Mills and McDonald in real time. The text messages, as well as the testimony of all witnesses, support this conclusion. The Court finds that this factor weighs in favor of the Government.

### v.     *Additional considerations*

As the application of the relevant factors above makes clear, this is not a straightforward case. But the Court does reiterate that the applicable test is based upon the totality of the circumstances and that, in addition to the articulated factors, the Court can look to other indicia of reliability. *See*, *e.g.*, *Jackson*, 328 F. App'x at 936.

With that consideration in mind, the Court finds some additional points to be relevant. The Court notes that Mary stayed in contact with law enforcement throughout the encounter, continuing to provide information to them as it occurred. Also, the Court notes that the text messages align with the testimony that she provided at the hearing. The text messages advised that

19

Derryberry and Jane would be traveling through Harmontown. And, after she was in the truck with them, the information she provided about where they were traveling was accurate.

The Court also finds relevant the source of Mary's information. Mary testified that she became aware that Jane possessed narcotics via a phone conversation between Jane and Theresa Grant (Jane's aunt and Mary's sister). Mary was not a participant in that phone conversation, but at the time Jane called Theresa, Mary was with Theresa and heard Theresa's side of the conversation. After that conversation concluded, Theresa told Mary that she had to go pick up Jane. Theresa told Mary that Jane had an ounce of fentanyl and an ounce of methamphetamine on her at that time.

In particular, the Court emphasizes that Mary was not a participant in that conversation. Mary did not personally hear Jane state that she possessed fentanyl and methamphetamine. Mary also never saw any drugs on the night in question. Defense counsel emphasized these points, and the Court is cognizant of them. But at the same time, the Court notes that Mary's testimony—that she was motivated to provide information to law enforcement because she knew that her daughter was involved in drug activity—is consistent with the manner in which she conducted herself that night. In other words, the Court does not find it critical that Mary never personally saw the drugs. The information she learned was consistent with the type of conduct in which she believed her daughter was engaged—based on her personal knowledge, which again is consistent with what she had previously discussed with Mills. Furthermore, the text message she sent to Mills after the encounter—expressing disappointment as to the fact that law enforcement did not locate the drugs—supports this conclusion.[8]

---

[8] The Court struggles to make sense of the after-the-fact text message expressing disappointment if Mary's motivation was not, at least in part, to attempt to get help for Jane.

The Court also notes the discrepancy in the alleged quantity of drugs. Although Mary testified that she believed Jane told Theresa that she possessed an ounce of fentanyl and an ounce of methamphetamine, when Mary spoke with Theobald at the scene, she stated that it was a ¼ ounce of fentanyl and a ½ ounce of methamphetamine. This is a clear inconsistency. Mary testified that she told Theobald these amounts because she was nervous.

Although the Court notes this inconsistency and is aware that it could weigh against Mary's credibility, the Court similarly notes that the appropriate consideration before the Court is whether the officers had reasonable suspicion to justify the stop at the outset. *See*, *e.g.*, *Lopez-Moreno*, 420 F.3d 420, 430. The fact that, several minutes into the stop, Mary provided a different weight of the alleged narcotics has little to no bearing on the constitutionality of the stop itself. It is also noteworthy that neither Mills nor McDonald testified that Mary ever told them a specific weight— McDonald's testimony addressed this issue briefly, but he only stated that it was a "substantial" amount. In other words, the specific weight was not part of the officers' reasonable suspicion calculation.

Additionally, although the parties did not delve too deeply into the issue, the Court does note Theobald's testimony that Mills and McDonald told him that the license plate would be registered to Orville Clolinger. Theobald testified that when he initiated the stop of the truck, he ran the tag, and the truck was indeed registered to Orville Clolinger. On cross examination, defense counsel questioned Theobald about the fact that his running of the tag was *not* reflected in the CAD report provided to Derryberry in discovery. Theobald explained that, in the normal course of business, those types of reports are not created until it becomes apparent that an individual is going to be taken into custody. Thus, when he ran the tag at the beginning of the stop, it would not be reflected in that particular report. Theobald testified that he believed the fact that he ran the tag

21

would be recorded somewhere, but he lacked knowledge as to *where*. The Court makes no finding as to whether the failure to include such information in the report is a good practice. But, for purposes of this hearing, the Court found Theobald's explanation to be credible, particularly considering that no contrary evidence was presented on that issue.

Furthermore, although the officers did not locate fentanyl or methamphetamine, Drew did locate a pipe hidden in Jane's pants. Although the Court recognizes that Derryberry's statements surrounding the pipe are inadmissible, the Court does, in its totality of the circumstances analysis, note the presence of drug paraphernalia.

In addition, the Court notes, as emphasized by the Government, that this is not a case involving an anonymous informant. The Fifth Circuit has distinguished cases involving anonymous informants from those involving known informants. *See*, *e.g.*, *Martinez*, 486 F.3d at 862 ("When the informant is known, her reputation can be assessed, and she can be held responsible if her allegations turn out to be fabricated. In anonymous informant cases, however, the tip alone seldom demonstrates the informant's basis of knowledge or veracity about the suspect's involvement in criminal behavior.") (internal citations and quotations omitted). Here, Mills and McDonald undoubtedly knew Mary prior to the night in question, were able to assess her reputation, and had the ability to hold her criminally responsible if they found out her allegations were fabricated.

The Court also feels compelled to address the Fifth Circuit's holding in *Powell*, a 2013 case upon which the Government relied heavily throughout its Response [46] and at the hearings.

In *Powell*, police initiated a stop of a vehicle after receiving a tip from a confidential informant that a vehicle traveling to Midland, Texas would be transporting a substantial amount of crack cocaine. *Id*. at 366. The informant described the make, possible model, and color of the

vehicle, as well as recounting the first three characters of the vehicle's license plate. *Id*. When officers observed a vehicle matching the description and traveling in the direction the informant indicated, a stop was initiated and 240 grams of crack cocaine were eventually located. *Id*. at 367. After the denial of a motion to suppress and the jury's return of a guilty verdict against the driver and the passenger of the vehicle, the Fifth Circuit was faced with multiple issues on appeal. *Id*. at 368.

Pertinent to this case is the Fifth Circuit's analysis as to the justification for the stop based on the informant's tip. One of the most noteworthy facts is that the confidential informant actually sold the crack cocaine to the defendants but did not disclose that fact to the police when providing the tip. *Id*. at 370. The Fifth Circuit noted that the informant's "role in the sale of the crack cocaine to [the defendants] is a clear mark against his credibility. However, we are mindful of the government's observation at oral argument that informants in criminal investigations are rarely removed from all aspects of the underlying criminality. While [the informant's] involvement in selling drugs and his concealment of this fact from [the officer] certainly cut against his personal credibility and reliability, *this is not the end of our analysis*." *Id*. (emphasis added). Continuing its analysis, the Fifth Circuit looked to the other relevant factors, including the specificity of the information, the ability of the officers to verify the provided information, and the freshness of the tip. *Id*. at 370-71. Ultimately, the Fifth Circuit concluded:

> The specificity, predictive value, and recency of [the informant's] tip are sufficiently strong to balance the flaws in [his] personal credibility and reliability. A total evaluation of these factors shows that the informant tip was supported by sufficient "indicia of reliability" to satisfy the reasonable suspicion requirements under *Terry*.

*Id*. at 371.

The Court finds *Powell* to be an instructive example as to the application of the totality of the circumstances test. Like in *Powell*, some considerations here weigh in favor of Derryberry—particularly, as emphasized above, the lack of clarity as to what Mary told Mills and McDonald regarding the type and weight of the alleged drugs that would be in the vehicle. However, as emphasized above, many aspects of her testimony, and the testimony of the officers, was, in this Court's view, credible. In addition, the Court emphasizes that, like in *Powell*, the information Mary provided did, to some extent, accurately predict future conduct. In her text message to Mills, Mary indicated that Derryberry and Jane would be in the vehicle traveling in the Harmontown area. That fact did indeed prove to be true.

The defense relies heavily on the Fifth Circuit's decision in *United States v. Roch*, 5 F.3d 894 (5th Cir. 1993). In *Roch*, a confidential informant advised a Houston, Texas police officer "that a man named Frank planned to pass some forged checks and threatened to kill the next cop he saw." *Id*. at p. 896. The informant further advised that Frank "possessed two guns, drove a white and orange pickup truck, and was staying in a local motel room with his girlfriend. The informant described him only as a blond, white male with tattoos on large portions of his body." *Id*. The officer then contacted an ATF agent and explained that he believed Frank was armed and that he felt Frank might be a convicted felon. *Id*. ATF agents set up surveillance for several hours and eventually saw a white and orange pickup truck leave the parking lot with a male driver and female passenger. *Id*. The agents then requested a local police officer to initiate a stop. *Id*. Ultimately, two firearms were found in the truck and the driver, Frank Roch (who turned out to be a convicted felon), was eventually—after the denial of his motion to suppress—convicted of knowingly possessing a firearm as a convicted felon. *Id*.

On appeal, the Fifth Circuit reversed Roch's conviction on the basis that the officers lacked reasonable suspicion to initiate the stop. *Id*. at 899. The Fifth Circuit emphasized multiple aspects of law enforcement's conduct prior to the stop:

> We note that the ATF agents and HPD officers did not observe any activity during the surveillance which would support a finding of reasonable suspicion that Roch was a felon in possession of a firearm. The surveillance of the motel began in the morning and continued through 4:00 PM. During that time, the agents did not see any tattoos on Roch's body corroborating his felon status or observe Roch carrying or attempting to conceal a gun. In fact, the surveillance failed to provide reasonable suspicion of any crime. The agents did not see Roch commit a criminal offense, engage in any questionable behavior, or break any traffic laws. The only activity the agents observed was a man and woman leaving the motel parking lot in [a] white and orange pickup truck, and driving to a filling station.
>
> . . .
>
> While first-hand interaction has often provided a sufficient basis of knowledge to find an indicia of reliability, we note the information provided by the informant here lacks considerable detail. The suspect is only identified as Frank. His last name is not provided. Frank is described only as a white male with blond hair with numerous tattoos. Approximations of his height and weight are absent. The pickup truck is only described by its orange and white color; there is no make, model, year of manufacture, or license number.

*Id*. at 898.

The Fifth Circuit also emphasized that law enforcement made no attempt to corroborate Frank's identity or his status as a convicted felon. *Id*. at 899. In fact, the court emphasized that there was no evidence that the ATF agents even attempted "to run a title check on the truck through its license plates or to check the registration list in the office of the motel to determine the names of the occupants who arrived in the truck." *Id*.

This Court finds *Roch* distinguishable. As to the substance of the tip itself, the Court again emphasizes that Mary did provide some prediction of *future* conduct. She notified law enforcement that Derryberry and Jane would be traveling together in a white truck and that they would be coming through Harmontown. All of that proved to be true.[9] Additionally, unlike in *Roch* where law enforcement had several hours to attempt to corroborate the tip, the events at issue in this case were happening in real time. Theobald was able to corroborate the type of truck, that it would be traveling through Harmontown, and the person to whom the vehicle would be registered. While the Court appreciates Derryberry's contention that law enforcement could possibly have done more in regard to seeking information about the weight and packaging of the drugs that were allegedly in the vehicle, the Court finds that law enforcement took steps to corroborate the information that it had.[10]

Consistent with the applicable law, the Court has considered the totality of the circumstances surrounding the stop. *See, e.g.*, *United States v. Estrada*, 459 F.3d 627, 631 (5th Cir. 2006) (noting that the reasonable suspicion determination "must be made based on the totality of the circumstances"). And the Court emphasizes that reasonable suspicion is a "low threshold, requiring that an official have some minimal level of objective justification for making the stop." *United States v. Castillo*, 804 F.3d 361, 367 (5th Cir. 2015) (citations and quotations omitted); *see also United States v. Alvarez*, 40 F.4th 339, 345 (5th Cir. 2022).

---

[9] The Court notes that the Fifth Circuit's emphasis on the ability to predict future conduct flows from Supreme Court precedent. *See, e.g.*, *Alabama v. White*, 496 U.S. 325, 332, 110 S. Ct. 2412, 110 L. Ed. 2d 301 (1990) ("What was important was the caller's ability to predict respondent's *future behavior*, because it demonstrated inside information—a special familiarity with respondent's affairs.") (emphasis in original).

[10] And while that information was not in and of itself indicative of criminal activity, it is similar to the type of information that the Fifth Circuit deemed relevant in *Powell*.

Although some considerations certainly weigh in favor of Derryberry, the Court, considering the matter objectively, finds that the officers had reasonable suspicion to justify the stop based on Mary's tip. Therefore, the Court finds that the Government has carried its burden. To the extent the present Motion [41] seeks suppression on the basis of a lack of reasonable suspicion to justify the stop, it is DENIED.

The Court again emphasizes, as it did at the conclusion of the second hearing, that this case presents a close call. The Court's conclusion today should not be interpreted as an approval of all practices utilized by law enforcement here. The Court merely concludes, based on the specific facts before it, that the Government has shown by a preponderance of the evidence that there was reasonable suspicion to justify the stop.

*Conclusion*

For the reasons set forth above, Derryberry's Motion [41] is GRANTED IN PART and DENIED IN PART. To the extent the Motion [41] seeks suppression of the statements Derryberry made after being placed in handcuffs, the Motion [41] is GRANTED. Those statements are inadmissible and are hereby SUPPRESSED. In all other respects, the Motion [41] is DENIED.[11]

As indicated at the conclusion of the second hearing, the Court sees no need to continue the trial of this matter. The Motion to Continue [59] is DENIED.

SO ORDERED, this the 10th day of February, 2023.

/s/ Sharion Aycock
UNITED STATES DISTRICT JUDGE

---

[11] Derryberry's Supplemental Brief [57] was filed on the docket as a motion, as opposed to a supporting memorandum. It shall be terminated as a pending motion on the docket.